280 F.Supp. 719 (1968)
UNITED STATES of America, Plaintiff,
v.
The SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL UNION NO. 36, AFL-CIO, and the Local No. 1 of the International Brotherhood of Electrical Workers, AFL-CIO, Defendants.
No. 66C 58(2).
United States District Court E. D. Missouri, E. D.
March 7, 1968.
*720 Richard D. FitzGibbon, Jr., U. S. Atty., by Robert H. Kubie, Asst. U. S. Atty., St. Louis, Mo., Gerald Jones and John Bleveans, Attys., U. S. Dept. of Justice, Southwestern Section, Civil Rights Division, Washington, D. C., for plaintiff.
Charles A. Werner, Schuchat, Cook & Werner, St. Louis, Mo., for defendant Sheet Metal Workers.
James K. Cook, Schuchat, Cook & Werner, St. Louis, Mo., for defendant International Brotherhood of Electrical Workers.

MEMORANDUM
MEREDITH, District Judge.
This case has been submitted for decision on the basis of briefs filed by the parties, exhibits, and testimony adduced at trial held June 15 through 20, 1967.
The United States Government filed suit against defendants on February 4, 1966, alleging that defendants had violated the Civil Rights Act of 1964 (42 U.S.C. § 2000e through § 2000e-15) and seeking injunctive relief to inhibit future violations. Defendant Sheet Metal Workers Union Local No. 36, AFL-CIO (hereinafter referred to as "Local 36") and defendant Local No. 1, International Brotherhood of Electrical Workers, AFL-CIO (hereinafter referred to as "Local 1") are the only two defendants against whom suit continued. Both are labor organizations as defined by 42 U.S.C. § 2000e, and both are within the scope of 42 U.S.C. § 2000e-2(c). The suit was filed by the Attorney General pursuant to 42 U.S.C. § 2000e-6, and this Court has jurisdiction thereunder.
When the original complaint was filed on February 4, 1966, it included two counts and several additional defendants. Count I of the complaint was dismissed by order of this Court, dated July 26, 1966. Thereafter, in response to a motion by the Government, all defendants remaining in Count II, except Local 36 and Local 1, were dismissed without prejudice, and on June 15 through 20, 1967, trial proceeded against Local 36 and Local 1 on Count II of the complaint. At the close of trial, plaintiff and defendants submitted proposed findings of fact and conclusions of law and supporting briefs.
The Civil Rights Act of 1964, 42 U.S.C. § 2000e-6, provides:
"Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States * * *."
The Civil Rights Act of 1964 went into effect on July 2, 1965, and, therefore, any violations of this Act by defendants must have occurred after that date and prior to February 4, 1966, the date on *721 which this suit was filed. The Government alleges that by failing to admit Negroes into Local 1 and Local 36 on a non-discriminatory basis, by failing to admit Negroes into apprenticeship training programs on a non-discriminatory basis, and by failing to operate their respective hiring hall referral systems on a non-discriminatory basis, defendants have discriminated against Negroes in violation of the latter's civil rights.
The Government alleges specifically that nepotism is a policy and practice of both unions, that the unions have failed to inform Negroes of the opportunities to become members of the unions, and that they have failed to organize employers who employ Negroes.
It is the function of this Court to determine, on the basis of the evidence presented at trial, whether during the period July 2, 1965, to February 4, 1966, the defendants have, in fact, engaged in a "pattern or practice" which constitutes a violation of the Civil Rights Act of 1964.
Local 36 is a labor organization representing sheet metal workers in the construction industry in the City of St. Louis, Missouri, and forty-four counties in the eastern half of the State of Missouri, and has contracts with most of the sheet metal contractors in the geographical area which it covers. The parties stipulated that on February 4, 1966, the date on which this lawsuit was filed, Local 36 had approximately 1,250 journeymen members, all of whom were white, and 110 apprentices, one of whom was Negro, and that at the time of trial, Local 36 had approximately 1,275 journeymen members, all of whom were white, and 116 apprentices, three of whom were Negro.
Persons who wish to become journeymen members of Local 36 may do so in one of three ways: by making direct application to the local and taking a journeyman's examination; through participation in the apprenticeship program; and as a result of Local 36's organizational campaigns.
Persons making direct application for membership in Local 36 fill out an Application for Journeyman Sheet Metal Worker Examination and are given written tests, a layout problem, and a test in welding. Those who pass these examinations then fill out an Official Application Form and upon payment of the standard initiation fee, which is one hundred times the current hourly wage rate for journeymen sheet metal workers, are admitted into union membership. There is no vote of the membership on new members and the application blank's spaces for vouchers are automatically filled in by members of the Executive Board.
There was no evidence that a Negro has, at any time, either before or since the passage of the Civil Rights Act of 1964, applied to take a journeyman's examination and thereby achieve membership in Local 36. There was also no evidence indicating that most of the persons achieving journeyman membership in Local 36 during the period from July 2, 1965, to April 15, 1967, were related to journeyman members of Local 36. Plaintiff sent out questionnaires to all one hundred fifteen persons admitted to Local 36 as journeyman members during this period, and of the ninety replies received, eighty (eighty-eight percent) indicated that the new member was not related by blood or marriage to members or former members or apprentices of Local 36.
Local 36 has a policy of organizing unorganized shops in its jurisdictional area, and persons in the shop being organized are not required to take a journeyman's examination. Local 36 charges an initiation fee of from $50 to $150 during an organizational campaign (depending on the location of the shop), but once a shop is organized, new persons coming into Local 36 are required to pay the regular fee of one hundred times the journeyman's hourly wage rate. The rate was approximately $5.00 per hour on January 1, 1966. In addition, since July 1, 1966, shops have been required to post a $2,000 bond to assure that *722 payments are made to welfare, pension, and vacation funds.
The evidence showed that Local 36 attempted to organize Kennedy & Sons Sheet Metal Shop, a Negro shop, in December 1966. This shop was under a Midwest Contractors Association collective bargaining agreement with Local 99 of the Congress of Independent Unions (CIU) for the period June 15, 1965, through March 1, 1967, and the month of December 1966, was the so-called "soft period" when organizational negotiations could take place without being in conflict with the contract bar rules of the National Labor Relations Board. Eugene Zimmerman, then business manager of Local 36, contacted Arthur Kennedy, owner of the shop, personally, and representatives of Local 36 contacted the sheet metal workers employed by Kennedy and left application forms for the men to sign. The negotiations between Local 36 and the Midwest Contractors Association, including Kennedy & Sons, were broken off by the Midwest Contractors Association and none of Kennedy's employees mailed or took completed application forms to Local 36.
Clarence Lee and Vernon Wells are Negro sheet metal workers, both with full-time jobs at McDonnell Aircraft Corporation, who have formed a partnership called Wells and Lee Heating Service. Lee testified that he spoke to Zimmerman in April 1967 about joining Local 36. Zimmerman told Lee that the initiation fee was $500 per man and that if Wells and Lee would come to the office, they could proceed to become members of Local 36. Zimmerman also told Lee that Local 36 would sign a contract with Wells and Lee Heating Service, and that the partnership would be required to post a $1,000 bond to insure payment of vacation moneys. Lee was to contact Zimmerman later, but never did, nor did Lee ever file a written or formal or informal application for membership in Local 36. Wells testified that he called Local 36 and spoke to some unidentified person who said it would cost $2,000 to join the union. Both Wells and Lee subsequently joined Local 99, CIU, and had no further interest in Local 36.
The sheet metal workers apprenticeship program is run by the Joint Apprenticeship Committee (hereinafter referred to as the JAC), which is composed of three sheet metal contractors and three sheet metal journeymen. In 1964, the JAC revised the qualifications and procedures of the program, and sent them to the Department of Labor for approval. On February 11, 1965, the Department of Labor notified the JAC that the program was in compliance with the Code of Federal Regulations, Title 29, Part 30, dealing with discrimination in apprenticeship and training. The revised procedures provide that all applicants must fill out an application, take qualifying tests administered by an independent testing agency, and be interviewed by the JAC. Applicants who receive eighty points out of a possible two hundred points on the tests and interview are placed on the "available for training" list according to point score, and the person on the list with the top point score is sent to a contractor when he requests an apprentice.
From July 2, 1965, to the date of trial, eighteen to twenty Negroes inquired at the union hall about the apprenticeship program, and of this group, twelve Negroes filled out application forms and were assigned a testing date. Only two of the Negroes appeared for the tests (even though twelve signed a form stating that they would appear), and these two went on to be interviewed and subsequently became apprentices. The parties stipulated that a third Negro had been accepted into the program in 1963, i. e., before the enactment of the Civil Rights Act of 1964.
The evidence showed that approximately sixty-six percent of the apprentices admitted to training since July 2, 1965, are not related by blood or marriage to a member or former member or apprentice of Local 36, and rejected applicants included at least five sons of members of Local 36, one of whom had a father, a brother and a cousin in Local *723 36, the brother being a current member of the Executive Board.
In May 1965, the JAC sent letters to thirty-four schools and organizations stating that the sheet metal workers apprenticeship program was in conformance with Title 29 and was accepting applicants, together with a summary of the amended qualifications and procedures. Similar information was published by the St. Louis Post-Dispatch in February 1966, in a one-quarter page story about the program, which was printed in response to a request from the JAC. In April 1967, letters and summaries were sent to eighty-four schools, agencies and organizations, and since January 1966 the JAC has cooperated with the Department of Labor's Apprenticeship Information Center in distributing information about the sheet metal workers apprenticeship program by means of newspapers, radio, television, and distribution of information to schools, minority groups, and interested persons.
There was no evidence that anyone has filed a complaint or charge against Local 36 with the Department of Justice, the Equal Employment Opportunity Commission, the Office of Federal Contract Compliance, or under state or local laws prohibiting racial discrimination. (§§ 296.010-296.070, V.A.M.S., and ordinances of the City of St. Louis, Missouri.)
Until January 1, 1968, Local 36 had a non-exclusive referral system which permitted anyone looking for work in the sheet metal trade, regardless of whether or not he was a union member, to sign an out-of-work card which was stamped with the date and time it was signed. Applicants were then placed on an out-of-work list in the order stamped on the card, and when a sheet metal contractor called the union hiring hall for a man, the top man on the list (and possessing special skills, if they were required for the particular job) was sent out, regardless of whether or not he was a union member. There is no evidence that a Negro ever signed up for work referral under the non-exclusive referral system in effect prior to January 1, 1968.
The revised referral system negotiated between Local 36 and the sheet metal contractors which went into effect on January 1, 1968, provides for four referral groups: Group I is composed of persons having four years experience in the sheet metal construction industry, who reside within the local's jurisdictional area, have passed a journeyman's examination, and have been employed under a collective bargaining agreement between the parties (Local 36 and the sheet metal contractors with whom it has collective bargaining agreements) for a period of at least one year in the last four years; Group II includes persons with four years experience in the sheet metal construction industry who have passed a journeyman's examination; Group III includes persons having one year experience in the sheet metal construction industry; and Group IV includes college students, registered applicants on the apprenticeship training list, and high school graduates seeking summer employment. All persons in Group I are referred out for work before anyone in Groups II, III or IV is contacted, all persons in Group II are referred out before anyone in Groups III or IV is called, etc.
The contract in which this new system is set forth provides that all referrals shall be made "without discrimination against such applicants by reason of membership or non-membership in the union, race, creed, religion, color, national origin, sex or ancestry * * *" It is clear that the groups distinguish between union and non-union members, but because the new system was not effective until long after the trial of this suit, the new system could not constitute a violation of the Civil Rights Act during the period from July 2, 1965, to February 4, 1966, and no evidence regarding its operational practices was presented. There was no evidence before the Court showing that the system in operation during the period July 2, 1965, to February 4, 1966, was in violation of the Civil Rights Act of 1964.
*724 Local 1 is a labor organization representing employees in the construction, manufacturing and service industries in the City and County of St. Louis and some twenty-four surrounding counties in the eastern and southern part of the State of Missouri. It is the bargaining representative for about ninety-five percent of the electricians engaged in the construction of major residential, commercial, and industrial projects in the City and County of St. Louis, and has collective bargaining agreements with a substantial majority of construction electricians in this area. Local 1 has approximately five thousand members, two thousand of whom have construction classifications.
Membership in Local 1 (like membership in Local 36) may be achieved by direct application to take a journeyman's examination and passing it, through participation in the apprenticeship training program, and as a result of Local 1's organization campaigns.
When making direct application, an applicant must be working at the electrical trade under Local 1, IBEW, collective bargaining agreement. The Executive Board of Local 1 investigates all applicants, and after inquiring about ability and work performance from past and/or present employers, the membership is presented with a recommendation for or against admission of each applicant. Admission to union membership is by majority vote of the membership present at a regular membership meeting. For some construction classifications, an applicant must pass an examination relating to the type of work involved, but every member in attendance at a membership meeting votes on all applications for membership regardless of his classification.
A person who is a member of Local 1 may change his classification after five years of experience, and the procedure for a change in classification is similar to the procedure for admission into membership. Members with non-construction classifications who desire to switch into construction classifications (which are generally better paid) can gain construction work experience during peak employment periods in order to qualify for a classification change.
On July 2, 1965, Local 1 had twenty-five Negro members, all in non-construction classifications, and by February 4, 1966, the number had increased to thirty-five. There were no Negroes in construction classifications and during this period no Negroes, other than Walter Hampton, discussed below, applied for membership in construction classifications. Since February 4, 1966, twelve Negroes have applied for membership in construction classifications and all twelve have been admitted.
Plaintiff sent questionnaires to the twenty-nine persons admitted as journeyman members with construction classifications during the period July 2, 1965, to August 31, 1966. Of the twenty-five persons responding, twenty-three were white, two were Negro and eight (about one-third) were related by blood or marriage to members or former members or apprentices of Local 1. Of the thirty-six persons who became members in non-construction classifications during the period September 1, 1966, to December 27, 1966, thirty-five responded to similar questionnaires, and of these thirty-five, thirty-four were white, one was Negro, and eleven were related by blood or marriage to members or former members or apprentices of Local 1.
Other than Walter Hampton, there is no evidence that since July 2, 1965, any Negro has applied for union membership and failed to achieve it.
Walter Hampton, a young man with five years experience in the electrical trade, made two trips to Local 1's union hall, one about October 22, 1965, and the other on November 8, 1965. In October, Hampton asked to join the union and was told by the business manager, Norman Lanemann, that in order to apply for membership in Local 1, a man had to be working at the trade for a contractor with whom Local 1 had a collective bargaining agreement. Lanemann suggested that Hampton go back to the hiring *725 hall and sign up on the out-of-work list (although Hampton was not out of work at the time), but Hampton did not do so. (Hampton denied that Lanemann so suggested, but Lanemann's testimony was corroborated by the testimony of the Superintendent of the Jefferson National Expansion Memorial, commonly called the "Gateway Arch", to whom Hampton related the incident by telephone moments after his conversation with Lanemann.) Lanemann's response to Hampton's request for an application blank was in accord with, and gave Hampton accurate information about, Local 1's practices and procedures. There is no evidence that Hampton was given incorrect information or that he was treated differently from other applicants on this occasion. Hampton returned to the union hall on November 8, 1965, at which time he did register for the out-of-work list by signing the appropriate card. Hampton was placed in the correct priority group according to his experience, and there was no evidence that anyone was improperly referred ahead of him. Hampton entered the army in January 1966 and thereafter was not available for referral by the union. While Hampton's testimony indicated that he did not completely understand the hiring hall procedures, there is no evidence that Hampton was treated differently from the way in which any other applicant in the same situation would have been treated, either because of his race or for any other reason.
Members are also admitted to Local 1 through organizing campaigns. The evidence presented at trial showed that prior to July 2, 1965, several Negro electrical contractors, among them Witt, Harding and Stuart, tried to get their shops organized under Local 1's auspices, and were repeatedly rebuffed. Since that date, however, each of these contractors has been told that he and his employees are welcome in Local 1.
Witt and his two Negro employees made arrangements to join Local 1 prior to the filing of this lawsuit, took the journeyman's examination in February 1966, and became construction members of Local 1 in March 1966. At the time suit was filed, James Harding, a Negro electrical contractor employing ten Negro electricians, was under contract with the CIU, which contract ran from June 15, 1965, to March 1, 1967. Until December 1966, Local 1 could not legally sign a contract with Harding Electric, but as soon as it could legally do so, Local 1 petitioned for an NLRB election, and late in February 1967 Local 1 was certified as bargaining representative for Harding's employees, all of whom became members of Local 1, with construction classifications, in April 1967.
In the weeks following the mid-December 1966 meeting between the AFL-CIO and members of the Midwest Contractors Association, Lanemann made repeated calls to Wilbur Stuart, another Negro electrical contractor, and requested that Stuart contact him. Stuart testified that he never did, because he has everything he wants with the CIU, of which he is a member.
Persons trained in the apprenticeship program sponsored by AFL-CIO affiliated contractors and Local 1 are admitted into union membership in construction classifications after serving a one-thousand hour probationary period. The apprenticeship program is run by a Joint Apprenticeship Committee (JAC), which is composed of three members of Local 1 and three electrical contractors (members of the National Electrical Contractors Association hereinafter referred to as "NECA"). The JAC meets once a month to supervise the program, but daily management of the program is entrusted to the Secretary-Director of the JAC, whose job is a full-time, salaried position. The position is presently filled by Michael Gibbons, president of Local 1. Apprentices are selected on the basis of objective tests and interviews. The tests are graded by Gibbons and the interviews are conducted by at least one representative from Local 1 and one representative from the NECA. Local 1, thus, has a substantial voice in the operation of the apprenticeship program, but does not exercise exclusive control over it.
*726 Local 1 admits that until 1964, sons of union members were given preference in applying for the apprenticeship program, but following the publication of Title 29, Part 30, C.F.R., the qualifying standards were revised to provide for selection of apprentices on the basis of objective criteria. The new standards were accepted by the Department of Labor's Bureau of Apprenticeship and Training in April 1964, as being in compliance with Title 29, and no complaints of discrimination have been filed with the Department of Justice, the Equal Employment Opportunity Commission, the Office of Federal Contract Compliance, or under state or local laws prohibiting racial discrimination. (§§ 296.010-296.070, V.A.M.S., and ordinances of the City of St. Louis, Missouri.)
The evidence showed that since July 2, 1965, four Negroes have passed the objective qualifying examinations for apprenticeship training. Of these, one failed to appear for his interview. The remaining three Negroes were interviewed and were placed in the program.
At plaintiff's request, questionnaires were sent to recent apprentice applicants concerning relations by blood or marriage to members of Local 1. With respect to the July 1965 apprenticeship applicant group: of the fifty-one placed, forty-eight responded, forty-seven of whom were white, one of whom was Negro, and sixty percent of whom were related to members or former members or apprentices in Local 1 by blood or marriage; of the three hundred seventy-eight rejected, two hundred fifty responded, fifty-three percent of whom were related to union members by blood or marriage. Of those in the latter group showing their race, two hundred thirty-five were white and three were Negro. With respect to the March-June 1966 group of applicants: of the eighty-eight accepted, seventy-three responded (sixty-seven white and three Negro), forty percent of whom were related to union members by blood or marriage; of the eighty rejected, sixty responded (fifty-six white and three Negro) of whom forty-three percent were related to union members by blood or marriage.
These figures do not provide evidence of racial discrimination and/or nepotism in the selection of apprentices.
Beginning in 1964, information about the availability of the electrician's apprenticeship program was sent to the public and parochial schools in Local 1's jurisdictional area, to the Bureau of Apprenticeship and Training, and to the Missouri Division of Unemployment. Since the opening of the Apprenticeship Information Center in December 1965, the JAC has provided the Center with full and current information on the standards and procedures of the apprenticeship program, and this information has been distributed by the Center through various media to interested parties. In addition, Local 1, the JAC, and the NECA have sought to publicize to the Negro community the opportunities offered by the electrical trade by sponsoring programs for counselors from predominantly Negro high schools, programs for Negro high school students, including "career day" appearances at high schools with Negro student bodies, meetings with civil rights groups, and appearances on vocational programs of lower schools with Negro student bodies.
The evidence shows that Local 1 has actively publicized the availability of apprenticeship training opportunities in the electrical trade to the Negro community since the 1964 revision of the apprenticeship program, and that Local 1's admission practices are designed to discover the best qualified applicants, regardless of race or relationship of the applicant to union members.
The referral system used by Local 1 in its hiring hall is similar in structure to the system which Local 36 adopted effective January 1, 1968. The hiring hall at Local 1 was created in November 1958, pursuant to a collective bargaining agreement between Local 1 and the St. Louis Chapter of the National Electrical Contractors Association. It provides that: "The Union shall be the sole and exclusive source of referrals of applicants for employment." *727 (Art. III, § 2), and that such applicants shall be selected and referred for employment "without discrimination against such applicants by reason of membership or non-membership in the Union * * *" It also provides, however, that applicants for referral shall be placed in one of four groupings, according to various factors, among which is their previous experience "under a collective bargaining agreement between the parties to this agreement." Group I includes journeymen in industrial construction who reside in a defined area and who "have been employed for a period of at least one year in the last four years under a collective bargaining agreement between the parties to this agreement." Group II includes journeymen in residential construction with the same qualifications. Group III includes experienced electricians (other than journeymen) "who have been employed for at least six months in the last three years in the electrical construction industry under a collective bargaining agreement between the parties to this agreement." Group IV includes: "All applicants for employment who have worked at the electrical construction industry for more than one year." There is a fifth classification, "O", not mentioned in the agreement, but used by the hiring hall to designate persons without experience who file applications. Since April 1966, a man must be physically present in the hiring hall to be referred out from it, and only when a contractor is seeking someone with special skills will the Business Agent (who runs the hiring hall) make telephone calls to persons not present in order to attempt to find someone to perform the work.
The evidence presented showed that only one Negro, Walter Hampton, signed up for referral under the hiring hall referral system. There was no evidence that Hampton, or anyone, who signed up for referral was placed in an improper group or passed over when an opportunity arose, or was otherwise discriminated against because of his race.
The Government argues that the groupings themselves are illegal because they distinguish between union and nonunion men, and because, in view of the past practices of these unions, such distinctions effectively discriminate against Negroes.
The Labor-Management Relations Act, 29 U.S.C. § 158(b) (2), provides:
"(b) It shall be an unfair labor practice for a labor organization or its agents 
"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section * *."
And subsection (a) (3) provides:
"(a) It shall be an unfair labor practice for an employer 
"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."
It has been held that an openended list whereby local members coming in later are placed ahead of non-members waiting for work simply because they are local members is an illegal preference under these sections of the Labor-Management Relations Act, N. L. R. B. v. Local 111, United Bro. of Carpenters, etc., 278 F.2d 823 (1st Cir. 1960). Original jurisdiction of such complaints, however, is vested in the National Labor Relations Board, 29 U.S.C. § 160; it does not constitute the kind of discrimination prohibited by the Civil Rights Act of 1964, and does not fall within the scope of this Court's original jurisdiction. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, at 48, 58 S.Ct. 459, 82 L.Ed. 638 (1938).
The Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(c) provides:
"It shall be an unlawful employment practice for a labor organization 
"(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

*728 "(2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
"(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."
Section 2000e-6(a), 42 U.S.C., provides:
"Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action * * *."
Such a "pattern or practice" must be shown to have existed after July 2, 1965, i. e., after the effective date of the Act, because discriminatory actions and conduct which occurred prior to that date cannot constitute a violation of the Act. In their Interpretative Memorandum of Title VII, Senators Clark and Case, two of the leading supporters of the Act, said of the title, "Its effect is prospective and not retrospective," 110 Cong.Rec. 7213, and that "the principal purpose of the Commission [Equal Employment Opportunity Commission] pressing complaints is to obtain future compliance." These Senators also noted:
"There is no requirement in title VII that an employer maintain a racial balance in his work force. On the contrary, any deliberate attempt to maintain a racial balance, * * * would involve a violation of title VII because maintaining such a balance would require an employer to hire or to refuse to hire on the basis of race." 110 Cong.Rec. 7213.
Such discriminatory hiring is specifically prohibited by 42 U.S.C. § 2000e-2(j), which provides:
"Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this sub-chapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."
Thus, in order to establish a violation of the Civil Rights Act of 1964 by these defendants, the Government must show that defendants engaged in a prohibited "pattern or practice" after July 2, 1965.
Such a "pattern or practice" is not established by evidence of "mere isolated acts of discrimination," Senator Humphrey, 110 Cong.Rec. 14,270, nor can the mere absence of Negroes in a particular group constitute proof of a pattern of discrimination in the absence of some showing that the group should represent a cross-section of a community in which there is a substantial proportion of Negroes, such as was the situation in the jury discrimination cases which establish the so-called "exclusion principle." Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Hernandez v. State of Texas, 347 U.S. *729 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); United States ex rel. Goldsby v. Harpole, 263 F.2d 71 (5th Cir. 1959); United States ex rel. Seals v. Wiman, 304 F.2d 53 (5th Cir. 1962); Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966). In the instant case, the exclusion principle, without additional supporting evidence, will not operate to establish a prima facie case for plaintiff.
The absolute absence of Negroes from a group, plus evidence of specific instances of exclusion after July 2, 1965, for racial reasons, has been held to constitute evidence of a "pattern or practice" of the type prohibited by the Act. For example, in the case of Cypress v. Newport News General & Nonsectarian Hospital Ass'n, 375 F.2d 648 (4th Cir. 1967), Negro doctors had not applied to join the staff of defendant hospital because of the latter's long-established practices of excluding Negroes and the former's sense of futility of such an effort in the face of the hospital's notorious discriminatory policies. Suit was brought only after two Negro doctors, both of whom had higher qualifications than some of the white doctors on the hospital staff, had applied for admission to the staff and been refused. The district court found that "[w]here no Negro physicians are on the hospital staff and application in proper form is made for staff membership by a Negro physician who meets the `paper' qualifications and proves his competency in his chosen specialty field (if any), a prima facie inference of discrimination exists wherever the action on said application is by secret ballot and without hearing from the applicant * * *" The Court concluded that the absence of any non-racial ground for the exclusion compelled the inference that Negro doctors were barred because of their race.
In the instant case, there is no evidence that any Negro who qualified for membership or apprenticeship training in defendant locals, who applied for such in proper form, and who passed objective tests and appeared for a scheduled personal interview, was excluded. On the contrary, the evidence shows that in every instance, qualified Negroes applying for union membership and/or apprenticeship training since July 2, 1965, have been admitted therein.
The referral system used by Local 36 during the period July 2, 1965, to February 4, 1966, was above reproach, and plaintiff does not allege otherwise. Local 36's new exclusive hiring hall referral system, effective January 1, 1968, is similar to the exclusive hiring hall referral system used by Local 1 in that both give older union members seniority over newer members and non-union men for purpose of work referrals.
An exclusive hiring hall referral system is not illegal per se, Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961); Local 100 of United Ass'n of Journeymen and Apprentices v. Borden, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963), nor is a referral system which gives old union members seniority over newer union members and non-union men. Local #42, Asbestos Workers, 164 NLRB No. 123 (1967); Local 367, IBEW, 134 NLRB No. 21 (1961).
Congress was aware of this problem when it debated the Civil Rights Act of 1964 prior to enactment. In response to Senator Hill's expressions of concern that "vested seniority rights" would not be protected under the Act, Senator Clark read into the Record a memorandum prepared by the Department of Justice, which stated in part:
"First, it has been asserted that title VII would undermine vested rights of seniority. This is not correct. Title VII would have no effect on seniority rights existing at the time it takes effect. * * * assuming that seniority rights were built up over a period of time during which Negroes were not hired, these rights would not be set aside by the taking effect of title VII. Employers and labor organizations would simply be under a duty not to discriminate against Negroes because of their race. Any differences in treatment based on established seniority *730 rights would not be based on race and would not be forbidden by the title." 110 Cong.Rec. 7207.
Senator Clark then concluded, "it is clear that the bill would not affect seniority at all." 110 Cong.Rec. 7207.
Despite the cases cited above, some courts have come very close to holding referral seniority based on union membership illegal.
The Third Circuit Court of Appeals upheld an NLRB ruling that a union may not require past employment under collective bargaining contracts as a basis for priority in referrals, on the grounds that "the Board was justified in prohibiting the use of the prior employment requirement until the advantages from unlawful referral disappear," N. L. R. B. v. Local 269, IBEW, 357 F.2d 51 (3rd Cir. 1966). In the instant case, however, there is no evidence that unlawful referrals have been made in the past, and, thus, no basis for destroying resulting seniority. There was, in fact, no evidence that the referral systems of either defendant were intended to, or in practice actually did, discriminate among referents on the basis of race or color. The absence of such evidence leaves plaintiff's allegation that the systems discriminated against Negroes unsupported by any evidence presented to this Court.
In brief, the evidence shows that prior to 1964 both defendants excluded Negroes. Since the effective ate of the Civil Rights Act of 1964, July 2, 1965, both unions have admitted and treated Negroes. Since the effective date of the Civil Rights Act of 1964, July 2, 1965, both unions have admitted and treated Negroes on the same basis that whites are admitted and treated. The record is devoid of any specific instance of discrimination. Further, both defendants have been making and are making a determined effort to recruit Negroes into their unions. This suit was filed at a time when no complaints of discrimination had been made to the Department of Justice, The Equal Employment Opportunity Commission, The Office of Federal Contract Compliance or to any state or city body set up to correct discrimination.
The Civil Rights Act of 1964 was not intended to penalize unions or others for their sins prior to the effective date of the Act. It is prospective only. Neither was it passed to destroy seniority rights in unions or in business. The Act specifically forbids a union or a business from giving preferential treatment to Negroes to correct an existing imbalance of whites. In order to be a violation of this Act, there must be an intentional pattern and practice of discrimination and not an isolated instance of discrimination. There is no pattern or practice of discrimination in this case since the effective date of the Act.
The Court finds that the evidence presented by the Government does not substantiate its allegations that defendants have violated the Civil Rights Act of 1964 by discriminating against Negroes so as to exclude them from union membership, trade apprenticeship training programs, or work referrals through union hiring halls. Accordingly, judgment will be rendered in favor of defendants, and an order will issue dismissing with prejudice plaintiff's cause of action against them.