**Clarence PENN, individually and on behalf of all others similarly situated, Plaintiff,**

**v.**

**William F. STUMPF et al., Defendants.**

**Civ. A. No. C–69 239.**

United States District Court, N. D. California.

Feb. 3, 1970.

Clifford C. Sweet and Richard P. Duane, of Legal Aid Society of Alameda County, Oakland, Cal., for plaintiff.

Edward A. Coggin, City Atty., and William C. Sharp, Deputy City Atty., Oakland, Cal., for defendants.

## MEMORANDUM OF DECISION

GERALD S. LEVIN, District Judge.

This action arises from a complaint for declaratory and injunctive relief filed by the plaintiff on behalf of himself and that class of persons similarly situated. Jurisdiction is alleged under 28 U.S.C. § 1343 and 42 U.S.C. §§ 1981–1983, and under 28 U.S.C. § 2201.

The plaintiff is an adult Negro male who applied to the Oakland Civil Service Board of Commissioners for an appointment to a position as an officer with the Oakland Police Department. Several steps must be successfully completed before any applicant can be considered for a position as an officer with the Oakland Police Department. These steps include a thirty minute written "Mental Ability" test, a two hour written "General Knowledge" test, a psychiatric test, an "Oral Examination" conducted by three members of the Oakland Police Department, and a "Background Investigation" conducted by members of the Oakland Police Department staff.

The plaintiff took the aforementioned written test, but, upon being informed that he had failed to pass it, was not permitted to complete the other steps prerequisite to employment. Plaintiff alleges that he received a failing score on this test solely because of the discriminatory nature of the test.

Plaintiff contends that the nature of the recruiting and hiring processes involved in employment with the *Oakland Police Department are violative* of the Constitutional rights to due process of law and of the equal protection of the laws to which he, and other Negro, Mexican American, and Spanish surname people of the class of which he is a member, are entitled.[1] Specifically,

1. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all Negro, Mexican American and Spanish surname, and other minority group members (1) who would be eligible for employment with the Oakland Police Department, but who have been denied or will be denied such employment because of the discriminatory procedures used to select policemen, and (2) who would be eligible for employment but are unaware or unable to accept such opportunities because of the discriminatory recruiting program surrounding selection of policemen.

Under the allegations of plaintiff's complaint, this class action is properly maintainable. Clark v. American Marine

**1240**

plaintiff alleges that the hiring and recruiting of officers for the Oakland Police Department discriminates against members of minority racial and ethnic groups because such activities do not take into account the cultural differences in non-Caucasian communities. In addition, plaintiff alleges that the members of the Oakland Police Department who are active in the hiring and recruiting programs are virtually all Caucasians and not screened for their knowledge of non-Caucasian cultures or for the presence of possible racial or ethnic biases.

Plaintiff also cites numerous statistics showing a marked discrepancy between the percentage of the Oakland population as a whole which is non-Caucasian and the percentage of those employed by the Oakland Police Department which is non-Caucasian. The plaintiff contends that this statistical discrepancy is prima facie proof of discrimination in hiring as practiced by the Oakland Civil Service Commission and the Oakland Police Department.

Named as defendants are the commissioners of the Oakland Civil Service Board of Commissioners; the Personnel Director of said Board and his agents; and the Chief of Police of the Oakland Police Department and his agents.

These defendants now move to dismiss the action against them.

Following an extensive briefing of the issues by both parties, the court is of the opinion that the complaint states a good cause of action and that the defendants' motion to dismiss will be denied for the reasons given hereafter.

## I. *The Defendants are Proper Parties*

Defendants claim that since the action is against them in their official capacities, it is in essence a suit against the municipality of Oakland and as such is not maintainable under 42 U.S.C. § 1983. This argument relies primarily on Harkless v. Sweeny Independent Sch. Dist. of Sweeny, Tex., 300 F.Supp. 794 (S.D.Tex.1969).

In *Harkless*, an action had been brought by several Negro teachers against a school district, the superintendent of schools, and the school board for failure to re-employ them.[2] The District Court granted defendants' motion to dismiss, finding that the defendants were not "persons" subject to suit within the meaning of the Civil Rights Act.[3]

The court reasoned from the Congressional history which was available that Congress had not intended the Civil Rights Act to apply to states or their

Corporation, 297 F.Supp. 1305, 1306 (E.D.La.1969) ; Carr v. Conoco Plastics, Inc., 295 F.Supp. 1281, 1287 (N.D.Miss. 1969). See also Evers v. Dwyer, 358 U.S. 202, 203–204, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958) ; Miller v. International Paper Company, 408 F.2d 283, 284–285 (5th Cir. 1969) ; Jenkins v. United Gas Corporation, 400 F.2d 28, 33–35 (5th Cir. 1968), reversing 261 F.Supp. 762, 763–764 (E.D.Tex.1966) ; Oatis v. Crown Zellerbach Corporation, 398 F.2d 496, 497 (5th Cir. 1968) ; Anderson v. City of Albany, 321 F.2d 649, 651–652 (5th Cir. 1963) ; Heilberg v. Fixa, 236 F.Supp. 405, 407 (N.D.Cal.1964), affirmed Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

2. In *Harkless*, several Negro teachers had lost their jobs because of a reduction in the teaching force due to desegregation.

Re-employment was based on an evaluation of past work. Unlike the present case, the failure to rehire the plaintiff Negro teachers in *Harkless* was determined not to be based on race upon the issue being submitted to a jury. No such determination has yet been made in the present case.

3. 42 U.S.C. § 1983 reads as follows:
Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. (Emphasis added.)

subdivisions.[4] Although finding little direct or conclusive legislative evidence on the matter, the court nonetheless concluded that (300 F.Supp. 807):

> Courts that have had occasion to apply *Monroe* [Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492] in this situation have uniformly held that suits may be maintained only against the officials individually, and that governmental boards and government officials in their official capacities are not persons within the meaning of § 1983. [Footnote omitted.]

Plaintiff contends, however, that *Harkless* is contrary to numerous other cases,[5] distinguishable on its facts from the present case, and wrongly decided. While the argument in *Harkless* appears logical, it does not commend itself to this court as being consonant with the Congressional purpose articulated in the Civil Rights Act. *Harkless* tells us that because the term "person" in the Civil Rights Act does not envision suit against municipalities, it must follow that suit is also to be barred against municipal officials, since to "punish" such officials, is merely an indirect method to avoid the wording of the statute and thus "punish" the municipality.

The *Harkless* argument may be sound where the Civil Rights action pursued is one for damages, for it is logical to assume that a judgment against a municipal official often expends itself on the public (municipal) treasury. Where the relief sought is, as here, in the nature of a declaratory judgment and/or injunction, no sound reason presents itself for immunizing municipal officials from suit under the Civil Rights Act. Such relief is merely to vindicate the abrogation of Constitutional rights. With no accompanying loss to the public treasury, it can hardly be in the public interest—or have been within the contemplation of Congress—not to provide a remedy for the claimed wrong, once the latter is proven.

As the Supreme Court said in Newman v. Piggie Park Enterprises, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968), in an analogous situation discussing a suit brought under 42 U.S.C. § 2000a–3(a) (discrimination in public accommodations):

> When a plaintiff brings an action under that Title, he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority. [Footnote omitted.]

The same considerations obtain here. If suit for damages against public officials cannot be maintained under the Civil Rights Act, then at least suit for equitable relief should be available to carry out a policy "of the highest priority." Here, too, since the suit is in the form of a class action, the plaintiff is vindicating not only his own rights, but also those of the class of which he is a member. Without such actions, there would be no practical way in which the public might "watch the watchers."

This latter view is the one sanctioned by the several cases cited *supra* in foot-

4. Cases holding municipalities immune from suit under the Civil Rights Act include, e. g., Diamond v. Pitchess, 411 F.2d 565, 567 (9th Cir. 1969); City of Boulder v. Snyder, 396 F.2d 853, 857 (10th Cir. 1968); Brown v. Town of Caliente, Nevada, 392 F.2d 546, 547–548 (9th Cir. 1968).

5. Injunctive relief under 42 U.S.C. § 1983 has been granted against public officials in their official capacities in a number of cases. See, e. g., Schnell v. City of Chicago, 407 F.2d 1084, 1086 (7th Cir. 1969) (superintendent of police); Jordan v. Hutcheson, 323 F.2d 597, 601 (4th Cir. 1963) (state legislative committee, its chairman, counsel, and process agent for city); Adams v. City of Park Ridge, 293 F.2d 585, 587 (7th Cir. 1961) (mayor, chiefs of police and fire, police magistrate, city treasurer, city clerk, city manager, city aldermen); Cottonreader v. Johnson, 252 F.Supp. 492 (M.D.Ala.1966) (mayor, chief of police, sheriff); Hurwitt v. City of Oakland, 247 F.Supp. 995 (N.D.Cal. 1965) (mayor, chief of police, acting city manager).

note 5, and it is the view which this court is disposed to follow.

## II.   *There Are Sufficient Allegations of Discrimination*

■ Defendants' main contention is that the facts alleged by plaintiff do not make out a prima facie case of (racial) discrimination, either intentional or incidental.   Defendants argue that since the same procedure is followed to determine whether an applicant is qualified to be a member of the Oakland Police Department, no matter what his racial or ethnic background, that therefore no group or class is discriminated against. Defendants contend that the testing and interviewing procedures are themselves "neutral"; if more Caucasians become policemen than do Negroes or Spanish-surname applicants it is an obvious, if unfortunate, result of the fact that Caucasians tend, on the whole, to have "better" educational and cultural backgrounds than do non-Caucasion applicants.

Plaintiff counters by claiming that the testing and interviewing techniques used are not calculated to determine which applicants will make "good" policemen, but merely serve to perpetuate the overwhelmingly Caucasian character of the Oakland Police Department because the procedures are culturally biased against the background of non-Caucasians.   Furthermore, plaintiff claims that the recruiting techniques are aimed almost solely at the Caucasian community and by-pass interested and capable persons in the non-Caucasian community.   Plaintiff argues finally that such discrimination is not accidental or even unavoidable, but is pursuant to knowing practices on the part of the defendants to keep non-Caucasians, in any significant numbers, out of the Oakland Police Department.

### A.   *The Tests*

Plaintiff contends that the tests used to determine fitness are not rationally related to the skills called for in a policeman, and that, in any event, they do not take into account the differing backgrounds and abilities of those persons from non-Caucasian communities.

While general intelligence tests are a commonly used method of screening applicants in many phases of public and private employment, recent studies on culture differences have made the validity of such tests increasingly suspect. See G. Cooper and R. Sobol, "Seniority and Testing under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion", 82 Harv.L.Rev. 1598, 1642–1643 (1969).

In Griggs v. Duke Power Company, 292 F.Supp. 243 (M.D.N.C.1968), a class action was brought on behalf of Negro workers who claimed discrimination in the tests used by defendant as a prerequisite to hiring.   The court held that 42 U.S.C. § 2000e (employment opportunities) did not require employers to utilize only those tests which accurately measure the ability and skills required for a particular job or group of jobs:

> A test which measures the level of general intelligence, but is unrelated to the job to be performed is just as reasonably a prerequisite to hiring or promotion as is a high school diploma." (*Id.* at 250.)

The court in *Griggs* concluded, however, that

> The evidence establishes that the tests were *professionally developed* to perform this function and therefore are in compliance with the Act.   (Emphasis added.)   (*Id.*)

In the present case, plaintiff alleges specifically that the tests in question have *not* been professionally developed or otherwise validated, so such tests would appear to be impermissible even under the liberal standard of *Griggs*.[6]

In United States v. H. K. Porter Company, 296 F.Supp. 40 (N.D.Ala.1968), a similar issue arose with regard to the use of tests for intra-company transfers

---

6.   Note in this regard the discussion in 82 Harv.L.Rev., *supra*, at 1598, 1665.

and promotions. The court said (296 F.Supp. at 76–77):

> For a court to find racial discrimination in the use of aptitude tests which have not been validated, there should be at least some evidence that the use of an aptitude test which has not been validated has resulted in discrimination and not merely the abstract proposition that test validation is desirable.

This is a reasonable approach, and we find it satisfied here by the plaintiff's allegations of the striking statistical discrepancy between the total percentage of non-Caucasians in the Oakland community and the total percentage of non-Caucasians presently employed by the Oakland Police Department.[7] While such a showing of a significant statistical discrepancy is not in itself dispositive, it is at least some indication that discriminatory forces, albeit subtle ones, may be afoot.[8]

**B.** *The Interview and Background Investigation*

Plaintiff also points to the oral interviews and background investigations necessary to the screening of applicants to the Oakland Police Department as being similarly culturally biased. Plaintiff argues that those who conduct these procedures are either unaware of the cultural differences between Caucasians and non-Caucasians or are simply racially prejudiced in their attitudes.

---

7. Plaintiff alleges that the Negro population of Oakland is between 32% and 45% of the city's total population, but that only 3%–4% of the Oakland Police Department is Negro. The respective figures for the Spanish and Mexican-surname population are alleged to be 8.6%–10% of the total population and only 0.7% of the Oakland Police Department.

   Plaintiff also points to the fact that there are at present only 8 more Negro policemen (out of a total of 650) than were employed in 1940, when the Negro population of Oakland was only 3% of the total population.

   Obviously such figures, standing alone, do not tell the whole story; certainly if only a very small percentage of non-Caucasians applied for positions as policemen it would be harder to show discrimination in their hiring, although it might still be the case that discrimination inhered in the policies of recruitment or in the requirements for employment. Plaintiff has alleged, however, that significant percentages of Negroes have in fact applied for positions with the Oakland Police Department (Pl. Complaint at p. 6):

   > In a survey conducted by the League of California Cities in 1967, it was revealed that more than twice as many Negros are applying from the available eligible population than Caucasians for law enforcement positions.

8. The jury selection cases cited by plaintiff are informative here of the attitude of courts towards the role of statistics where racial discrimination is alleged, but such cases are not determinative of the matter at hand. In the jury selection cases, such as Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) and Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967), the Supreme Court struck down convictions because rendered by juries on which it was determined that Negroes had been unconstitutionally excluded. In these situations the names of prospective jurors were drawn from the tax rolls, and so a marked discrepancy in the percentage of Negroes on the tax rolls with those on the jury panels could only be explained by discrimination. Once certain minimal prerequisites had been met, selection to the jury panels should have been random and "automatic."

   In the present case, however, selection of policemen is not automatic, nor, concededly, is everyone from a particular group or groups eligible for employment therefor. Nonetheless, "In the problem of racial discrimination, statistics tell much, and Courts listen." State of Alabama v. United States, 304 F.2d 583, 586 (5th Cir. 1962), affirmed per curiam 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). See also Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (Jan. 19, 1970) ; United States v. Plumbing & Pipefitting Industry, Local 73 (S.D.Ind. Aug. 15, 1969) 61 L.C. Par. 9329, at 6863. *But cf.* Lewis v. City of Grand Rapids, 356 F.2d 276, 289–290 (6th Cir. 1966), cert. den. 385 U.S. 838, 87 S.Ct. 84, 17 L.Ed.2d 71 (1966) ; United States v. Sheet Metal Wkrs. Int. Ass'n, L. U. No. 36, 280 F.Supp. 719, 728–729 (E.D.Mo.1968).

Plaintiff cites many cases in support of his position, but it is clear that none of those cases bear on the issue at hand. There is no question here of overt racial classification, nor of differing standards for Caucasians and non-Caucasians, nor even of imposing on non-Caucasians requirements which, as a practical matter, they simply cannot fulfil. On the other hand, this court is hesitant to say that, as a matter of law, the techniques and procedures utilized by the Oakland Police Department in recruiting and hiring new policemen are free from inherent discrimination.

■ A procedure may appear on its face to be fair and neutral, but if in its application a discriminatory result ensues, the procedure may be constitutionally impermissible. See Meredith v. Fair, 298 F.2d 696, 701 (5th Cir. 1962), cert. den. 371 U.S. 828, 83 S.Ct. 49, 9 L. Ed.2d 66 (1962); Lea v. Cone Mills Corporation, 301 F.Supp. 97, 100, 102 (M. D.N.C.1969). Cf. Yick Wo v. Hopkins, 118 U.S. 356, 359, 373–374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

■ Despite plaintiff's allegations to this effect, it is unnecessary for this court to decide whether the defendants acted with knowledge or purpose in adopting and utilizing the hiring and recruiting procedures under question here. The plaintiff in a Civil Rights action need not allege the deefndant's specific intent to deprive him of his constitutional right[s]. See Whirl v. Kern, 407 F. 2d 781, 787 (5th Cir. 1968). As the court said in another context in Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2d Cir. 1968),

> But the fact that the discrimination is not inherent in the administration of the program, but is, in the words of the District Court, "accidental to the plan," surely does not excuse the planners from making sure that there is available relocation housing for all displacees. "Equal protection of the

laws" means more than merely the absence of governmental action designed to discriminate; as Judge J. Skelly Wright has said, "we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C.1967).

Defendants cite Brody v. McCoy, 259 F.Supp. 940 (S.D.N.Y.1966) for the proposition that, even if there is inequality of treatment here, it is rational and does not arise to the level of invidious discrimination. Brody, however, involved a situation wholly unlike that before the court now, and did not involve any charge of racial discrimination. The court merely concluded that experience bears on job fitness, a notion with which this court has no quarrel, but which is hardly sufficient to resolve the issues raised in the present case.

### III. The Rights Asserted by Plaintiff Are Protected Under the Civil Rights Act

The Civil Rights Act provides redress only for the violation of a privilege or right recognized under the Constitution or laws of the United States. Plaintiff claims a denial of due process and of equal protection of the laws in the practices and policies relative to employment with the Oakland Police Department. The allegations of plaintiff's complaint are sufficient to show a deprivation of rights or privileges "secured by the Constitution and laws."

On point here is a recent statement by the Ninth Circuit In Whitner v. Davis, 410 F.2d 24, 30–31 (9th Cir. 1969):

> While there may. be no constitutional right to public employment as such, there is a constitutional right to be free from unreasonably discriminatory practices with respect to such employ-

ment. [Citing cases.] It is also established that, apart from discrimination, public employment may, under some circumstances, be so supervised and controlled as to raise the question of whether there has been an impairment of constitutional rights. [Citing case.] [9]

The defendants' final argument is that the right which the plaintiff seeks to enforce is in the nature of a monetary or property right, and hence one which is not enforcible under the Civil Rights Act.

The cases reveal a considerable divergence between the courts on their approach to the "personal liberties versus mere property right" requirement of the Civil Rights Act. Many courts have accepted this distinction and refused to entertain an action because "only" a property or monetary right was involved.[10] Other courts have rejected the distinction or, to avoid its effect, have characterized "property" claims in terms of nonproperty concepts—such as denial or due process or equal protection of the laws.[11] For a good summary of the split in this area see Hornbeak v. Hamm, 283 F.Supp. 549, 551–553 (M.D. Ala.1968), affirmed per curiam 393 U.S. 9, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968). See also Collins v. Bolton, 287 F.Supp. 393, 401 (N.D.Ill.1968).

Were this court faced with the problem as a matter of first impression, it would be inclined to reject a strict "property-personal liberty" test as determinative of jurisdiction under the Civil Rights Act, both because such a distinction is not wholly appropriate in this area [12] and because it is often unworkable in practice. However, this is not a question of first impression nor does this court have to pass on the merits of the controversy. Instead, it is clear that even if the distinction be accepted, plaintiff's claim to a denial of employment is in the nature of a right far more precious than "mere property" and

9. Cf. Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Norwalk CORE, *supra*, at 927.

10. See Bradford Audio Corporation v. Pious, 392 F.2d 67, 72 (2d Cir. 1968); Bussie v. Long, 383 F.2d 766, 769 (5th Cir. 1967); McManigal v. Simon, 382 F. 2d 408, 410 (7th Cir. 1967), cert. den. 390 U.S. 980, 88 S.Ct. 1099, 19 L.Ed. 2d 1276 (1968), reh. den. 390 U.S. 1036, 88 S.Ct. 1405, 20 L.Ed.2d 297 (1968); Howard v. Higgins, 379 F.2d 227, 228 (10th Cir. 1967); Ream v. Handley, 359 F.2d 728, 731 (7th Cir. 1966); Martin v. King, 298 F.Supp. 420, 421 (D.Colo. 1969); Booth v. General Dynamics Corporation, 264 F.Supp. 465, 470 (N.D. Ill.1967); Abernathy v. Carpenter, 208 F.Supp. 793, 795 (W.D.Mo.1962), affirmed per curiam 373 U.S. 241, 83 S.Ct. 1295, 10 L.Ed.2d 409 (1963).

11. See Willis v. Reddin, 418 F.2d 702, (9th Cir. Nov. 10, 1969); Mansell v. Saunders, 372 F.2d 573 (5th Cir. 1967); McGuire v. Sadler, 337 F.2d 902, 906 (5th Cir. 1964); Hornsby v. Allen, 326 F.2d 605, 608, 610–612 (5th Cir.1964); Cobb v. City of Malden, 202 F.2d 701, 705 (1st Cir. 1953); Glicker v. Michigan Liquor Control Commission, 160 F.2d 96, 98, 100–101 (6th Cir. 1947); Burt v. City of New York, 156 F.2d 791, 792 (2d Cir. 1946); Joe Louis Milk Company v. Hershey, 243 F.Supp. 351, 354, 357 (N.D.Ill.1965); Schlosser v. Walsh, 5 F.Supp. 993, 997 (D.S.D.1934).

12. The origin of the "property-personal liberty" distinction appears to be based on an analogy drawn from the concurrence of Mr. Justice Stone in Hague v. C. I. O., 307 U.S. 496, 531–532, 59 S.Ct. 954, 83 L.Ed. 1423 (1938). Mr. Justice Stone argued that wherever a right or immunity claimed was one of personal liberty, not dependent for its existence upon the infringement of property rights, federal jurisdiction would lie without proof that the amount in controversy exceeded $3,000 [the amount then required for federal question jurisdiction]. This, contended Mr. Justice Stone, was because many of the rights secured by the Constitution were incapable of valuation.

From these words have some later courts concluded, perhaps unfortunately, that actions would lie under the Civil Rights Act only if a "personal liberty", and not a "property right", were involved. This is not what Mr. Justice Stone intended to say, nor does this conclusion follow necessarily from his words.

certainly incapable of precise pecuniary measure.

In so finding, this court is following a recent and persuasive authority dealing with facts relevant to those in the present case. In Madison v. Wood, 410 F.2d 564 (6th Cir. 1969), a Negro police officer brought a Civil Rights action contending that he had been demoted because of his race. He claimed a denial of equal protection of the laws, namely, a tortious invasion of his right to pursue his chosen profession. The court agreed (410 F:2d at 567): "Appellant's claim that he was deprived of personal liberty through alleged discrimination practices by Appellees amounts to just that."

## IV. *Conclusion*

■ Under the liberal spirit of the Federal Rules of Civil Procedure, it is axiomatic that pleadings are to be construed most strongly in favor of the pleader. DeWitt v. Pail, 366 F.2d 682, 685 (9th Cir. 1966); 2A Moore's Federal Practice Par. 12.08, at 2271, 2274. The test for determining the sufficiency of a complaint upon a motion to dismiss is likewise a liberal one. As the Supreme Court said in Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957):

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

Accord: *DeWitt, supra.*

For the reasons given above, this court cannot say that it appears beyond doubt that the plaintiff herein can prove no set of facts in support of his claim which would entitle him to relief.

Therefore, defendants' motion to dismiss is denied.

And it is so ordered.