Mildred **HARKLESS**, Alice Mae Jones, John P. Jones, Robert C. Woodard, Yarbough B. Kennedy, Willie L. Dotson, Florence Jones, Lillian F. Jammer, Benjamin F. Leviston and Velma L. Shelby, Plaintiffs,

v.

The **SWEENY INDEPENDENT SCHOOL DISTRICT OF SWEENY, TEXAS**, Fred Miller, Superintendent, Dr. Fletcher Hester, Weldon Bailey, E. H. Wallace, Tom B. Mays and E. N. Windler, Board Members, Defendants.

Civ. A. No. 66–G–34.

United States District Court
S. D. Texas,
Galveston Division.

June 6, 1969.

See also D.C., 278 F.Supp. 632.

Jack Greenberg, James M. Nabrit, III, Conrad K. Harper, William B. Turner and W. Haywood Burns, of NAACP Legal Defense and Educational Fund, Inc., New York City, Weldon H. Berry, Houston, Tex., and Thomas H. Dent, Galveston, Tex., of Dent, King, Cromwell and Wycliff, Houston, Tex., for plaintiffs.

Grant Cook, of Reynolds, White, Allen & Cook, Houston, Tex., for defendants.

## MEMORANDUM .OPINION AND ORDER

NOEL, District Judge.

### 1. Preface

After its adoption of a plan of complete school desegregation in the spring of 1966, defendant Sweeny Independent School District ordered the number of its faculty reduced for the school year 1966–67. In effecting the reduction, seventeen Negro teachers were not offered reemployment. Twelve of these brought this action for injunctive relief and money damages, alleging violation of their civil rights.

Plaintiffs named as defendants the district as such, and the superintendent of schools and the members of the district's school board, in both their individual and official capacities. But, at the time of voir dire examination of the jury panel, plaintiffs' counsel moved to dismiss all of the individual defendants in their individual capacities. The motion was granted, leaving as defendants only the district and the individual defendants in their official capacities.

Subsequently, and in response to a suggestion by the Court that subject matter jurisdiction over the remaining defendants might be lacking, defendants moved to dismiss on this ground. Briefs were submitted by all parties, and the motion was carried with the case pending the conclusion of trial.

Defendants' motion to dismiss, as well as numerous other motions listed later in this memorandum opinion and order, is now before the Court for decision. After careful consideration of the facts and applicable law, and for the reasons which follow, the Court is of the opinion that although subject matter jurisdiction is present, defendants' motion to dismiss should be granted because of plaintiffs' failure to state a claim upon which relief can be granted.

### 2. Factual Background

Prior to the school year 1965–66, the Sweeny Independent School District operated a racially segregated school system. White students and faculty were assigned to one group of schools. Negro students and faculty were assigned only to the George Washington Carver School.

During the spring of 1965, and in immediate response to the guidelines promulgated by the United States Department of Health, Education and Welfare for the desegregation of public schools, the board of trustees for the district adopted a two-phase plan of desegregation. The plan was submitted to and approved by the Department of Health, Education and Welfare. Thereafter, the district initiated the first phase of the plan, which was (a) that each student, under this plan, be permitted to attend the school of his choice and (b) desegregated kindergarten classes be formed, each for the school year 1965–66. The second phase of the desegregation plan, which was to commence in 1966–67, called for the complete desegregation of the system, including abolition of the George Washington Carver School as such, and the employment of all teachers without regard to race.

During the 1965–66 school year the district consisted of five schools: the primary school (kindergarten through third grade), the intermediate school (grades four through six), the junior high school (grades seven through nine), the senior high school (grades ten through twelve), and the George Washington Carver School (grades one through twelve). All faculty and all students at the George Washington Carver School were Negroes. Students of both races, including 65 Negro students, attended the other four schools in the district but only White teachers taught at these schools. During this school year, the district employed twenty-four Negro teachers and one Negro principal.

All teaching and instructional personnel in the district were then and are now hired by the board of trustees upon recommendation by the superintendent of schools, who from 1958 to the present has been Mr. Fred Miller. The board of trustees has never employed anyone except upon recommendation of the superintendent. All teachers in the district are hired on a year-to-year basis. While the superintendent has at times received longer contracts, no teacher has ever had a contract of more than one year.

Each year non-teaching professional persons are recommended by the superintendent for re-employment at the regular February meeting of the board of trustees. The superintendent usually presents his recommendations for re-employment of classroom teachers at the regular March meeting of the board of trustees. New teachers and other personnel are recommended as needed. The board of trustees votes on the recommendations of the superintendent at the meeting in which they are presented.

The superintendent of schools bases his recommendations for re-employment of classroom teaching personnel on a system of teacher evaluation. Separate evaluations are made of each teacher in the system by his or her principal, the curriculum director and the superin-

tendent. During the period when the school district operated a dual system as well as during the 1965–66 school year, White teachers were rated and compared only with other White teachers, and Negro teachers, only with other Negro teachers. As a result of the desegregation plan approved by the United States Department of Health, Education and Welfare, the teacher evaluation process used in the spring of 1966 for evaluation of all teachers to be recommended for re-employment for the 1966–67 term, differed from previous evaluations. For the first time each teacher in the system was evaluated and compared with all other teachers in the system, both Negro and White, without regard to race. The evaluation process was especially critical at this time because a staff study ordered by Superintendent Miller indicated that there would be at least twelve fewer teaching positions in 1966–67 than there were in 1965–66.

In early March 1966, Superintendent Miller requested all principals to rate their teachers on an evaluation form published by the Steck Company of Austin, Texas (Steck form 3528). In addition he requested each principal and the district's curriculum director to rate each teacher by assigning that teacher a number from one to ten, ten being as good as they had seen and one being unsatisfactory.[1] Superintendent Miller also rated each teacher in the system on this numerical scale.

Superintendent Miller added the three numerical ratings and used the combined total as well as the completed Steck forms, in preparing his recommendations for re-employment to the school board.[2] He did not recommend for re-employment seventeen teachers from the George Washington Carver School. The board of trustees approved Miller's recommendations at its March 8, 1966, meeting.

On March 9, 1966, Miller wrote all teachers not recommended for re-employment, informing them of the action of the board of trustees. In addition, he stated: "It's possible that you may be recommended and approved for a 1966–67 contract at a later date. This possibility is conditioned upon the available positions within the district, your qualifications for specific available positions and your competence as a teacher." Miller also offered each teacher not recommended an opportunity to come to him for a conference.

Two of the teachers not recommended immediately obtained new teaching positions elsewhere. They did not complete their 1965–66 contracts, resigning instead on April 15, 1966. Subsequently, all but two of the plaintiffs in this action also obtained teaching positions elsewhere.

In accordance with the desegregation plan adopted the previous year, the Sweeny Independent School District completely integrated its school system at the start of the 1966–67 school year. The George Washington Carver School was abolished as a Negro school. All students of all races in grades ten, eleven and twelve enrolled in Sweeny Senior High School. All students of all races in grades seven, eight and nine enrolled in the Sweeny Junior High School. All students of all races in

---

1. At the request of Superintendent Miller, the district's curriculum director, C. W. New, also prepared informal anecdotal evaluations on each of the Carver faculty members. During the trial Superintendent Miller testified that because he feared racial trouble at the start of the 1966–67 school year, he asked New to prepare the anecdotal evaluations to assist him in defending or criticizing the Carver faculty members if the need arose. He also testified that he did not use the anecdotal evaluations in the process of preparing his recommendations for the March 8, 1966, board meeting. Plaintiffs disputed this assertion, and attacked it vigorously in extensive and searching cross-examination and in argument of counsel.

2. As is noted in note 1 *supra*, the parties at trial disagreed with respect to whether Miller also used the anecdotal evaluations in preparing his recommendations to the school board.

grades four, five, and six enrolled in the Sweeny Intermediate School, which was housed in the former George Washington Carver School. All students of all races in kindergarten and in grades one, two and three enrolled in the Sweeny Primary School. In kindergarten and grades one through six, students were assigned to classroom units strictly on the ratio of races existing within a given grade. For example, if twenty-five percent of all fourth grade students were Negro, each fourth grade class contained twenty-five percent Negro and seventy-five percent White students. In all required or basic courses in the higher grades, students were assigned strictly on the racial ratio of each course as in the elementary grades. The racial ratio of elective courses at the secondary level depended on which students signed up for them. This system of racial balancing as outlined in the desegregation plan and implemented for the first time in 1966–67 has been used every semester since September 1966.

On May 23, 1966, twelve [3] of the Negro teachers not rehired filed this suit, naming as defendants the school district, its superintendent, and the members of its board of trustees. The individuals named as defendants were sued in their individual as well as their official capacities. Plaintiffs alleged that the suit was brought as a class action on behalf of themselves and all other Negro teachers similarly situated. Jurisdiction was asserted under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983. The complaint alleged that plaintiffs and all other members of their class (Negro teachers not rehired by the district for the 1966–67 school year) were not rehired solely because of race. The complaint sought a preliminary and permanent injunction enjoining all defendants (the school district, the board of trustees, and the superintendent) from refusing to hire and assign teachers without regard to race and specifically from failing to offer teaching contracts

for the 1966–67 school year to plaintiffs and members of their class solely because they are Negroes. In addition, plaintiffs sought damages for back pay and other allowances, costs, and reasonable attorneys' fees. The request for an immediate preliminary injunction was carried with the case.

Defendants answered the complaint on June 15, 1966, and objected that the suit was not a proper class action under Rule 23(a), F.R.Civ.P. Subsequently, defendants filed a plea in abatement alleging that plaintiffs had failed to exhaust administrative remedies. Counsel for both sides began discovery proceedings, and pre-trial conferences were held on November 18, 1966; December 13, 1966; November 16, 1967; March 8, 1968; April 9, 1968; and November 22, 1968. On April 25, 1967, the Court ordered the action stripped of its character as a class action, ordered the plaintiffs to proceed individually, and denied defendants' plea in abatement. On November 16, 1967, plaintiffs moved for leave to amend the complaint to include a claim that the methods used by the district in not rehiring them violated the due process clause of the Fourteenth Amendment. Leave to amend was granted, the motion to amend being deemed to constitute the amended complaint. Defendants filed an amended answer, and demanded a jury trial.

Plaintiffs moved to strike the jury demand. On January 19, 1968, the Court overruled the motion to strike the jury demand as to the amended complaint and transferred the cause to the jury docket. See Harkless v. Sweeny Independent School District, 278 F.Supp. 632 (S.D. Tex.1968). Thereupon, plaintiffs moved to dismiss the amended complaint insofar as it raised a jury issue, requested the case be transferred to the nonjury docket, and alternatively moved for leave to take an interlocutory appeal. Defendants moved to have the entire case decided by a jury, except for purely equitable issues.

---

3. Two of the teachers named as plaintiffs in the original complaint were subsequently dismissed as plaintiffs at their request.

On June 6, 1968, the Court granted defendants' motion for jury trial on all issues triable to a jury, denied plaintiffs' motion for a transfer to the non-jury docket, denied plaintiffs' motion to dismiss the amended complaint, and denied the motion for leave to take an interlocutory appeal. Subsequently, the Court denied a motion for leave to intervene filed by the National Education Association.

On March 3, 1969, ten of the original plaintiffs and all defendants announced ready and the case proceeded to trial. During the course of voir dire examination, plaintiffs moved to dismiss all of the individual defendants in their individual capacities, electing to proceed instead only against the defendant school district and against the superintendent and board members solely in their official capacities.[4] This motion was made for tactical reasons which are obvious from the record. The Court granted the motion and allowed the parties to amend the pretrial order accordingly. After reflection on the possible consequences of the dismissal, the Court sua sponte raised the issue of subject matter jurisdiction in open court and requested the parties to submit briefs, with particular emphasis on the relevance of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed. 2d 492 (1961).[5] Briefs were submitted and the question was carried with the case.

On March 13, 1969, the case was submitted to the jury on special interrogatories. The jury found:

1. That race was not a factor in the failure of the board of trustees to offer re-employment for the school year 1966–67.

2. That the board of trustees at its March 8, 1966, meeting decided that the teaching staff of the district would have to be reduced as a result of desegregation.

3. That the qualifications of the ten plaintiffs to teach in the district were fairly and impartially evaluated and compared with the qualifications of all other teachers who taught in the system during the school year 1965–66.

4. That before recruiting from outside the system, the board did not fail to determine that the plaintiffs were not qualified to fill any vacancies.

5. That Superintendent Miller and the board of trustees acted in good faith at all times and in every respect in the process of the board's decision not to offer the plaintiffs re-employment for the school year 1966–67.

6. That a factor relied upon by the board in not offering re-employment to seven of the plaintiffs was the fact that these particular plaintiffs were parties to this law suit.

At the close of plaintiffs' evidence the defendants moved for summary judgment as to the claim for money damages on the ground that there was no money appropriated by the school district to pay such a judgment if awarded. The motion was ordered carried with the case and both parties submitted briefs on the point. Defendants subsequently moved (1) to dismiss the case for lack of jurisdiction on the ground that a school district is not a "person" within the meaning of 42 U.S.C. § 1983 (the Monroe v. Pape issue mentioned above); (2) to dismiss the case for lack of evidence sufficient to raise the fact issue that plaintiffs were not rehired because of their race and that they were denied due process by the procedures employed in evaluating them for employment and in failing to rehire them; (3) to dismiss plaintiffs' due process prayer for lack of jurisdiction; (4) to dismiss plaintiffs' claim for attorneys' fees for lack of evidence sufficient to raise the fact issue that the defendant district was or had been guilty of unreasonable or obdurate obstinacy in considering plaintiffs for re-employment; (5) for an instructed verdict on plaintiffs' claims for money recovery and attorneys' fees; and (6) for judgment in accordance with the verdict of the jury. In making this last contention, de-

4. Tr. 67–81.

5. Tr. 1047–49.

fendants argued that the jury's answer to the last interrogatory was merely evidentiary in view of their answers to the other interrogatories.

After the verdict was returned, plaintiffs moved (1) for leave to further amend their amended complaint and the amended pre-trial order in order to conform the issues pled and relief prayed for, to the evidence and issues as developed at trial; (2) for a directed verdict; (3) for judgment notwithstanding the verdict; and (4) for a new trial on the ground that the verdict of the jury, insofar as it is adverse to them, is against the clear weight of the evidence.

The parties have briefed and argued all of the pending motions at length, both in the course of trial and in a post-trial hearing called for that purpose. All are now ripe, but only plaintiffs' motion to amend and defendants' motion to dismiss need be reached. Attached to plaintiffs' motion is the proposed amendment to their amended complaint, which for convenience will be designated their second amended complaint. It is a copy of their prior complaint with certain modifications, namely the deletion as plaintiffs of the two original plaintiffs heretofore dismissed and deletion of the allegation of a class action, consistent with the order of the Court. However, the copy does not make clear that by virtue of the trial amendment requested by counsel for plaintiffs, the individual defendants are now named and sued in their official capacities only.

Plaintiffs' motion to file their second amended complaint and to amend the pre-trial order is granted, provided, however, counsel for plaintiffs shall within ten (10) days (a) furnish the Clerk for filing a second amended complaint which names as plaintiffs only those left in the case and which has deleted from it references to the class action heretofore ruled on by the Court, adversely to the contentions of plaintiffs and, which clarifies the capacity in which the individual defendants are sued; and (b) prepare an amendment to the pre-trial order consistent with their second amended complaint

and this order of the Court, and furnish same to opposing counsel for approval and for entry by the Court. When approved by the Court each will be filed by the Clerk but, be deemed to have been filed concurrently herewith.

### 3. *Reasons for Dismissal of Complaint*

 For the reasons that follow, the Court holds that it does have subject matter jurisdiction of this cause by virtue of 28 U.S.C. § 1343(3), but that the said second amended complaint, hereinafter referred to as the complaint, must be dismissed for failure to state a claim upon which relief can be granted under 42 U.S.C. § 1983. Because this holding is dispositive, it is unnecessary to enter findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P., on the merits of plaintiffs' claims, to accept or reject the jury's verdict, or to act upon any other of the motions now pending. All facts set out in the above statement of the case, to the extent that they are relevant to the disposition of the motion to dismiss, are determined to be jurisdictional facts for the purposes of such motion. This determination, however, is not intended to be, and is not a finding of any fact concerning the merits of this cause, nor a finding of any fact with reference to any of the parties' other pending motions.

The relevant issue put at rest by Monroe v. Pape and brought to the attention of counsel at trial, does not deprive this Court of subject matter jurisdiction. *Cf.* Romero v. International Terminal Operating Co., 358 U.S. 354, 359, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Plaintiffs' allegation that jurisdiction lies under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 is sufficient to give this Court the jurisdiction to determine whether it is empowered to grant the relief sought. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963). However, the question of whether or not the complaint states a claim upon which relief can be granted is illuminated by Monroe v. Pape. While

defendant has not raised it by formal motion under Rule 12(b) (6), F.R.Civ.P., both parties have briefed it fully,[6] and it is now before the Court for decision.

In this case, as in Monroe v. Pape, the jurisdiction specified and relied upon in plaintiffs' complaint is that granted by 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983. These provide:

> § 1343. Civil rights and elective franchise.
>
> The District courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
>
> \* \* \* \* \* \*
>
> (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
>
> \* \* \* \* \* \*
>
> § 1983. Civil action for deprivation of rights.
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The issue before this Court, therefore, is whether § 1983 imposes liability on the school district and the individual defendants in their official capacities. Stated differently, it is whether these defendants are "person[s]" within the meaning of that section.

The statute now codified as 42 U.S.C. § 1983 was enacted as § 1 of the Act of April 20, 1871.[7] Little direct evidence has been found in the legislative history of that Act casting light on the meaning of the word "person" as it appeared in § 1. Rep. Shellabarger stated that § 1 was modeled on § 2 of the Act of April 9, 1866,[8] which

> provides [for] a criminal proceeding in identically the same case as this one provides a civil remedy for, except that the deprivation under color of State law must, under the civil rights act, have been on account of race, color, or former slavery. This section of this bill, on the same state of facts, not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship.[9]

Rep. Shellabarger then argued that if the Congress possessed the constitutional power to enact the criminal statute, "then it is equally competent to pass into law

---

6. Plaintiffs in their Supplemental Trial Brief frame the issue as whether "the Monroe rule does exempt defendants from liability under Section 1983". p. 3. Defendants argue in their "Brief in Support of Defendant's Motion to Dismiss for Lack of Jurisdiction" that "this Honorable Court does not have jurisdiction to grant the relief herein sought by the Plaintiffs." pp. 1–2.

7. Ch. 22, 17 Stat. 13.

8. Ch. 31, 14 Stat. 27, now 18 U.S.C. § 242. The history of this statute is traced in Screws v. United States, 325 U.S. 91, 98–100, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

9. Cong.Globe, 42d Cong., 1st Sess. 68 (Mar. 28, 1871) (appendix) [hereinafter cited as "Globe," with page and date only], reprinted in The Reconstruction Amendments' Debates 493 (Va.Comm'n on Const.Govt.1967) [hereinafter cited as Debates]; accord, Globe 568 (April 11, 1871), reprinted in Debates 547 (remarks of Sen. Edmunds).

this first section of this bill." [10] In this particular, § 1 of the 1871 Act and § 2 of the 1866 Act together are similar to § 2 of the 1871 Act, which imposed criminal sanctions on "each and every person" engaging in certain criminal conspiracies and then provided that anyone injured as a result of such a conspiracy could maintain an action for damages "against any one or more of the persons engaged in such conspiracy".[11] As it is difficult to imagine a criminal prosecution directed against a state, it seems equally unlikely that the civil remedies were intended to be directed against anyone except individuals.

Other remarks in both houses of Congress support the proposition that § 1 was not intended to impose civil liability on governmental units. Thus Senator Thurman, an opponent of the bill, could speculate that

> every hotel-keeper, every steamboat man, every keeper of a place of public amusement, every school director, may be liable under this bill because he does not give to the colored people the absolute social equality of mixing indiscriminately with the whites at places of public amusement, or in the hotels, or on the steamboats, or in the schools. Every railroad company, if it sets apart a particular car for colored people, though it may be as good a car as any in the train, is, upon this interpretation of the Constitution, liable to an action in the Federal courts under this bill, should it become a law.[12]

And Rep. Whitthorne, another opponent, was moved to predict

that if a police officer of the city of Richmond or New York should find a drunken negro or white man upon the streets with loaded pistol flourishing it, &c., and by virtue of any ordinance, law, or usage, either of city or State, he takes it away, the officer may be sued, because the right to bear arms is secured by the Constitution, and such suit brought in distant and expensive tribunals.[13]

Senator Frelinghuysen, in discussing the meaning of the Fourteenth Amendment's direct prohibition against states, remarked:

> How is the United States to protect the privileges of citizens of the United States in the States? It cannot deal with the States or with their officials to compel proper legislation and its enforcement; it can only deal with the offenders who violate the privileges and immunities of citizens of the United States.[14]

Focusing on the means for enforcing that Amendment, Senator Frelinghuysen continued:

> There are three classes of remedies that might be applied: civil remedies, criminal remedies, and public or national relief.
>
> As to the civil remedies, for a violation of these privileges, we know that when the courts of a State violate the provisions of the Constitution or the law of the United States there is now relief afforded by a review in the Federal courts. And since the fourteenth amendment forbids any State from making or enforcing any law abridging these privileges and

10. Globe 68, reprinted in Debates 493, *supra* note 9.

11. *Cf.* the remarks of Rep. Dawes, Globe 476 (Apr. 7, 1871), reprinted in Debates 536, discussing §§ 1 and 2 of the 1871 Act as a unit. The civil portion of § 2 of the 1871 Act is now codified as 42 U.S.C. § 1985. The criminal portion is codified in scattered sections of Title 18 of the United States Code.

12. Globe 217 (Apr. 13, 1871) (appendix), reprinted in Debates 554.

13. Globe 337 (Mar. 29, 1871), reprinted in Debates 502. *See also* Globe 49–50 (Mar. 28, 1871) (appendix), reprinted in Debates 498 (remarks of Rep. Kerr) ; Globe 482 (Apr. 5, 1871), reprinted in Debates 537 (remarks of Rep. Wilson of Ind.) ; Globe 209 (Apr. 1, 1871) (appendix), reprinted in Debates 519 (remarks of Rep. Blair of Mo.).

14. Globe 501 (Apr. 6, 1871), reprinted in Debates 541.

immunities, as you cannot reach the Legislatures, the injured party should have an original action in our Federal courts, so that by injunction or by the recovery of damages he could have relief against the party who under color of such law is guilty of infringing his rights. As to the civil remedy no one, I think, can object.[15]

On the other hand, an extensive search has failed to uncover any evidence that in enacting § 1 of the Act, now 42 U.S.C. § 1983, the Congress intended to impose civil liability on states or state subdivisions.[16] The congressional purpose expressed in §§ 1 and 2 of the Act is perhaps best stated in the words of Rep. Burchard:

> For the neglect or refusal of a State to perform a constitutional duty, the remedies and power of enforcement given to the General Government are few and restricted. It cannot perform the duty the Constitution enjoins upon the State. If a State fails to appoint presidential electors, or its Legislature to choose Senators, or its people to elect Representatives, Congress cannot act for them. Nor do prohibitions upon States authorize Congress to exercise the forbidden power. It may doubtless require State officers to discharge duties imposed upon them as such officers by the Constitution of the United States. A State office must be assumed with such limitations and burdens, such duties and obligations, as the Constitution of the United States attaches to it. The General Government cannot punish the State, but the officer who violates his official constitutional duty can be punished under Federal law. What more appropriate legislation for enforcing a constitutional prohibition upon a State than to compel State officers to observe it? Its violation by the State can only be consummated through the officers by whom it acts. May it not then equally punish the illegal attempts of private individuals to prevent the performance of official duties in the manner required by the Constitution and laws of the United States?[17]

So the bill was passed by the House and sent to the Senate. There Senator Sherman offered an amendment, which the Senate adopted, rendering " 'the inhabitants of the county, city, or parish' in which certain acts of violence occurred liable 'to pay full compensation' to the person damaged or his widow or legal representative."[18] This amendment, now 42 U.S.C. § 1986, was rejected by the House, and rejected again when the conference committee reported a variation.[19] Only when the provision for municipal liability was deleted, to be replaced by a provision extending "liability in damages to 'any person or persons, having knowledge that any' of the specified wrongs are being committed", did the amended bill pass.[20]

In both houses of Congress the debate was vigorous on the question whether the Sherman amendment was constitutional or desirable. Senator Sherman supported it as a means for compelling men of wealth and property to take action against the Klan.[21] Rep. Butler of Massachusetts pointed out that

15. *Id.*, reprinted in Debates 542. These remarks may have been in answer to those of Rep. Cox two days before, Globe 455 (Apr. 4, 1871), reprinted in Debates 534. *See also* Globe 459–460 (Apr. 4, 1871), reprinted in Debates 534 (remarks of Rep. Coburn).

16. Other references to § 1 include Globe 153 (Apr. 4, 1871) (appendix), reprinted in Debates 529 (remarks of Rep. Garfield); Globe 313 (Apr. 6, 1871) (appendix), reprinted in Debates 544 (remarks of Rep. Burchard).

17. Globe 314 (Apr. 6, 1871) (appendix), reprinted in Debates 545.

18. Monroe v. Pape, 365 U.S. 167, 188, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961).

19. *Id.* at 188–189, 81 S.Ct. at 484.

20. *Id.* at 189–190, 81 S.Ct. at 485.

21. Globe 761 (Apr. 18, 1871), reprinted in Debates 566.

804

the opponents of the amendment treated it

as if it were a punitive section only. It is not. It is an insurance section. It insures the citizen the protection of the laws; and the considerations as to the want of power to punish or the want of power to interfere with the crimes in the States nowhere applies to this section. It is not punitive or penal, but remedial simply. And the question comes up whether the United States, under our Constitution, have the power to give a remedy to the citizen when he is wronged.[22]

But these arguments failed to carry the day. After the House had rejected the first conference report, Rep. Poland, a member of the second conference committee, explained the compromise to the House as follows:

This brings me to the last cause of disagreement—to what is known as the Sherman amendment. I did understand from the action and vote of the House that the House had solemnly decided that in their judgment Congress had no constitutional power to impose any obligation upon county and town organizations, the mere instrumentality for the administration of State law. We informed the conferees on the part of the Senate that the House had taken a stand on that subject and would not recede from it; that that section imposing liability upon towns and counties must go out or we should fail to agree. At the same time we said to them there was a disposition on the part of the House, in our judgment, to reach everybody who was connected, either directly or indirectly, positively or negatively, with the commission of any of these offenses and wrongs, and we would go as far as they chose to go in inflicting any punishment or imposing

any liability upon any man who shall fail to do his duty in relation to the suppression of those wrongs.

The result was this section which we have reported in lieu of the Sherman amendment. The substance of it is that any person who has knowledge of any of the offenses named, any of the wrongs already described, any of the conspiracies indicated in the second section are about to be committed, it shall be his duty to use all reasonable diligence within his power to prevent it; and if he fails to do so, so much damage as is occasioned to anybody in consequence of his failure, for so much he shall be responsible in an action.[23]

Senator Edmunds, also a member of the conference committee that had devised the compromise, described it as a provision "dealing with the citizen under the Constitution," and stated that the compromise had been occasioned by "difficulties which had occurred to a majority of the House of Representatives respecting our power to deal with the particular organization in a State called a county or a town." [24]

After it had considered the history of the Act of April 20, 1871, in detail, the Supreme Court in Monroe v. Pape reached the following conclusion:

The response of the Congress to the proposal to make municipalities liable for certain actions being brought within federal purview by the Act of April 20, 1871, was so antagonistic that we cannot believe that the word 'person' was used in this particular Act to include them. Accordingly we hold that the motion to dismiss the complaint against the City of Chicago was properly granted.[25]

This Court has reviewed that same legislative history at length, and can find no reason to suppose that the 42d Congress intended to distinguish munici-

22. Globe 792 (Apr. 19, 1871), reprinted in Debates 568.

23. Globe 804 (Apr. 19, 1871), reprinted in Debates 569.

24. Globe 820 (Apr. 19, 1871), reprinted in Debates 570.

25. 365 U.S. at 191–192, 81 S.Ct. at 486.

palities from other kinds of political subdivisions of a state. In fact, all the legislative evidence before this Court suggests the opposite, for every argument supporting or opposing the imposition of municipal liability applies indiscriminately to political subdivisions of every kind.[26] The decision in Monroe v. Pape may not be confined, as plaintiffs urge, to suits against municipalities.

The Supreme Court's recent decision in Tinker v. Des Moines Independent Community School District[27] is not inconsistent with this broad reading of Monroe v. Pape. While *Tinker* was a suit like this one, brought under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 against a school district as well as its board members and officials,[28] the Court's failure to discuss the district's amenability to suit under § 1983 places *Tinker* in a class of cases ably distinguished by Justice Douglas in Monroe v. Pape:

> In a few cases in which equitable relief has been sought, a municipality has been named, along with city officials, as defendant where violations of 42 U.S.C. § 1983 were alleged. See, *e. g.*, Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 [1943]; Holmes v. City of Atlanta, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 [1955] [per curiam]. The question dealt with in our opinion was not raised in those cases, either by the parties or by the Court. Since we hold that a municipal corporation is not a "person" within the meaning of § 1983, no inference to the contrary can

any longer be drawn from those cases.[29]

*Tinker*, therefore, is no authority for a proposition neither raised nor discussed by the district court[30] or on appeal.[31] And this Court has found no case suggesting that the Supreme Court would overrule Monroe v. Pape or restrict its applicability to municipalities.

Plaintiffs cite one case as authority for the proposition that a county is a "person" within the meaning of § 1983. United States v. Holmes County, 385 F.2d 145 (5th Cir. 1967). That suit was an action brought under 42 U.S.C. § 1971, a companion section to § 1983 safeguarding voting rights. As the Court of Appeals noted in *Holmes County*, § 1971 was amended by the Civil Rights Act of 1960 to provide expressly for suits against states and state subdivisions. *See* § 601(b), 74 Stat. 90. Nevertheless, in holding that the county could be sued directly, the Court of Appeals elected not to rely on the 1960 amendment. Instead, the court cited Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) for the proposition that a county is a "person" within the meaning of § 1983, and reasoned that the same term in § 1971 must also include a county, "since both [provisions] were enacted with the aim of vindicating constitutionally protected rights." 385 F.2d at 148. *Griffin*, however, was not "an action at law, suit in equity, or other proper proceeding for redress" under § 1983, but rather a suit, originally under the 3-judge statute, 28

26. *E. g.*, Globe 791 (Apr. 19, 1871), reprinted in Debates 567 (remarks of Rep. Willard); Globe 793 (Apr. 19, 1871), reprinted in Debates 568 (remarks of Rep. Poland).

27. 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed. 2d 731 (1969).

28. *See* Tinker v. Des Moines Indep. Community School Dist., 258 F.Supp. 971–972 (S.D.Iowa 1966), aff'd per curiam by an equally divided court, 383 F.2d 988 (8th Cir. 1967) (en banc), rev'd, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

29. Monroe v. Pape, 365 U.S. 167, 191 n. 50, 81 S.Ct. 473, 486, 5 L.Ed.2d 492 (1961).

30. *See* Tinker v. Des Moines Indep. Community School Dist., 258 F.Supp. 971 (S.D.Iowa 1966).

31. *See* Tinker v. Des Moines Indep. Community School Dist., 383 F.2d 988 (8th Cir. 1967) (en banc) (aff'g per curiam by an equally divided court), rev'd, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

U.S.C. § 2281, "to enjoin racial segregation in the public schools of Prince Edward County, Virginia." [32] Section 1983, in fact, was neither discussed nor even cited by the Supreme Court in *Griffin*. In the passage cited by the Court of Appeals in *Holmes County*, 377 U.S. at 233, 84 S.Ct. 1226, the Supreme Court was disposing of the suggestion that the Eleventh Amendment forbids suits against counties. [33]

*Holmes County* was, as noted above, a voter registration case brought under 42 U.S.C. § 1971. To the extent that it holds that a county or other state subdivision is an entity that may be sued under 42 U.S.C. § 1983, it is inconsistent not only with Monroe v. Pape and the legislative history quoted above, but also with four earlier Fifth Circuit decisions, two antedating and two following Monroe v. Pape. [34] Extensive research, both by the parties and by the Court, has failed to uncover any reported case imposing civil liability under 42 U.S.C. § 1983 on any governmental subdivision. Because the cited holding in *Holmes County* is no more than an alternate ground for the decision, because the suit there was not one seeking to impose civil liability under 42 U.S.C. § 1983, and because every court since Monroe v. Pape confronted by a suit against a political subdivision under 42 U.S.C. § 1983 (including the Court of Appeals for the Fifth Circuit in the cases just cited) has applied the *Monroe* decision broadly, [35] this Court must decline to follow *Holmes County* to whatever extent it may apply in this case. [36] Accordingly, it is the opinion of this Court that the defendant district is not a "person" as that term is used in § 1983, [37] and that plaintiffs are not en-

---

32. Allen v. County School Bd. of Prince Edward County, 249 F.2d 462, 463 (4th Cir. 1957).

33. *See* Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); Kennecott Copper Corp. v. State Tax Comm'n, 327 U.S. 573, 579, 66 S.Ct. 745, 90 L.Ed. 862 (1946), cited at 377 U.S. 233, 84 S.Ct. 1234.

34. Charlton v. City of Hialeah, 188 F.2d 421 (5th Cir. 1951); Hewitt v. City of Jacksonville, 188 F.2d 423 (5th Cir. 1951); Blume v. City of DeLand, 358 F.2d 698 (5th Cir. 1966) (per curiam); Mayhue v. City of Plantation, 375 F.2d 447, 451–452 (5th Cir. 1967).

35. *E. g.*, Dodd v. Spokane County, 393 F.2d 330 (9th Cir. 1968) (county); Brown v. Town of Caliente, 392 F.2d 546 (9th Cir. 1968) (town, county); Williford v. California, 352 F.2d 474 (9th Cir. 1965) (state); Harvey v. Sadler, 331 F.2d 387 (9th Cir. 1964) (school district); Link v. Greyhound Corp., 288 F.Supp. 898 (E.D.Mich.1968) (county); Johnson v. Hackett, 284 F.Supp. 933 (E.D.Pa. 1968) (township, township board of commissioners); United States ex rel. Gittlemacker v. Pennsylvania, 281 F.Supp. 175 (E.D.Pa.1968) (city, city hospital, state); Baxter v. Parker, 281 F.Supp. 115 (N.D.Fla.1968) (county, sheriff and deputy sheriff in their official capacity).

36. As an alternate ground for declining to follow *Holmes County*, this Court records its belief that if the issue there presented again arises before the Court of Appeals for the Fifth Circuit, that court may well reconsider and decline to follow the reasoning in *Holmes County*. As noted above, in *Holmes County* the court reasoned that counties are persons under § 1983, that § 1971 and § 1983 are both statutes "enacted with the aim of vindicating constitutionally protected rights," whence counties are persons under § 1971. Section 1971, however, derives not from the Act of April 20, 1871, but from the Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140. Thus it would appear that the syllogism in *Holmes County*, contains a non sequitur, for as the Supreme Court recognized in Monroe v. Pape, *see* 365 U.S. at 190–191, 81 S.Ct. 473, the Reconstruction Congress employed the term "person" in different ways at different times. This ground for declining to follow the reasoning of *Holmes County* is entirely separate from the ground mentioned in the text, namely that the case cited as authority in the opinion does not support the major premise of the opinion.

37. Out of an abundance of caution, defendant has cited to the Court cases decided by the Texas Supreme Court holding school districts to be "local public corporations of the same general character as municipal corporations." Love v. City of Dallas, 120 Tex. 351, 40 S.W.2d 20 (1931); accord, Lewis v. Independent

titled to and may not be granted relief of any kind against the district under the authority of § 1983. Plaintiffs therefore have failed to state a claim against the district upon which relief can be granted.

Plaintiffs also attempt to distinguish *Monroe* on the ground that the individual defendants in this case were dismissed only in their individual capacities, with the suit proceeding against the individual defendants in their official capacities, as well as against the district. Courts that have had occasion to apply *Monroe* in this situation have uniformly held that suits may be maintained only against the officials individually, and that governmental boards and governmental officials in their official capacities are not persons within the meaning of § 1983.[38] This is only reasonable.

The legislative history of the Act of April 20, 1871, indicates clearly that "county and town organizations" were excluded from the coverage of the Act because the Congress believed that they should not be held responsible for damage caused by the wrongs which were the subject of that act.[39] A suit against an official in his official capacity is equivalent to a suit against his principal, the state subdivision he represents. Only if a suit is brought against the official in his individual capacity can it be said, to use the language of Rep. Burchard, that "The General Government cannot punish the State, but the officer who violates his official constitutional duty can be punished under Federal law."[40]

The 42d Congress clearly could not have intended to exclude state subdivisions as such from the ambit of § 1983, and yet authorize suits to be maintained against state officials solely in their official capacities. Plaintiffs thus have failed to state a claim against the individual defendants in their official capacities, as well as against the district.

■ As a final source for sustaining this Court's power to grant the relief they seek, plaintiffs assert that because "the complaint in paragraphs I and X expressly sought relief on the additional grounds of the due process and equal protection clauses of the Fourteenth Amendment," these clauses, "coupled with the foundation of jurisdiction under 28 U.S.C. Section 1343(3), give this Court jurisdiction to redress the wrongs to plaintiffs." This argument, too, is untenable. Section 1343 grants to the district courts jurisdiction only over civil actions "authorized by law to be commenced by any person". It cannot be argued that the Fourteenth Amendment itself authorizes the commencement of civil actions. To so construe it would be to ignore the express terms of the Amendment and render the enactment of 42 U.S.C. § 1983 superfluous. It has been held above that 42 U.S.C. § 1983 does not authorize the commencement of this suit against these defendants. Moreover, plaintiffs have failed to come forward with another statute authorizing such commencement, and this Court is aware of no such statute. Therefore, as 28 U.S.C. § 1343(3) is not sufficient in the absence

School Dist., 139 Tex. 83, 161 S.W.2d 450 (1942). Texas school districts thus are within the letter of the *Monroe* decision, as well as its spirit.

38. Glancy v. Parole Bd., 287 F.Supp. 34 (W.D.Mich.1968) (parole board); Johnson v. Hackett, 284 F.Supp. 933 (E.D. Pa.1968) (township board of commissioners); Baxter v. Parker, 281 F.Supp. 115 (N.D.Fla.1968) (sheriff and deputy sheriff in their official capacity).

39. Remarks cited note 26 *supra*.

40. Remarks quoted in text accompanying note 17 *supra*; *accord*, Ex parte Young,

209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908):

> If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

of another statute to authorize the prosecution of civil actions against persons alleged to have violated another's constitutional rights, plaintiffs' claim must be dismissed.

For the foregoing reasons, judgment will be entered in this cause dismissing the claims asserted by plaintiffs in their second amended complaint.

The Clerk will file this memorandum opinion and order and the separate writing constituting the judgment of the Court and furnish copies to each counsel of record.